**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| UNOWEB VIRTUAL, LLC, | Civil Action No._____ |
| *Plaintiff,* | |
| v. | JURY TRIAL DEMANDED |
| SEARS HOLDINGS CORPORATION, | |
| *Defendant.* | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff UnoWeb Virtual, LLC ("UnoWeb" or "Plaintiff"), by and through its attorneys,

brings this action and makes the following allegations of patent infringement relating to U.S.

Patent Nos. 8,037,091 ("the '091 patent") and 9,589,273 ("the '273 patent") (collectively, the

"patents-in-suit").  Defendant Sears Holdings Corporation ("Sears" or "Defendant") infringes the

patents-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et*

*seq*.

### INTRODUCTION

1.      Sears, in an effort to expand its product base and profit from the use and sale of

specific e-commerce systems, including methods of advertising and content distribution that

were unknown prior to the development of the patents-in-suit, has undertaken to copy the

technologies disclosed in the patents-in-suit.

2.      John Almeida is the inventor of the patents-in-suit.[1]  Mr. Almeida developed the

technologies at issue in this case in response to his exposure to the unique problems that retailers

and advertisers faced from the specific architecture of the internet.

3.      UnoWeb is based in Plano, Texas.  UnoWeb developed UnoWeb AdMind,

UnoWeb WayVi, and UnoWeb OpenCommerce, and its technologies can be seen, in part, at

---

[1] John Almeida is the inventor of 16 issued U.S. patents, 38 published U.S. patent applications,
and additional pending unpublished patent applications before the United States Patent and
Trademark Office ("USPTO").

www.unoweb.com and www.unowebdemo.com.

4.      Mr. Almeida is the founder and owner[2] of UnoWeb and a resident of Plano, Texas.  Mr. Almeida sought patent protection for his inventions.  A software developer who moved to the United States from Brazil, Mr. Almeida worked on e-commerce applications in the first wave of internet businesses in the mid-1990s.  Mr. Almeida worked for TradeYard.com[3] and Roidirect.com.[4]  These early internet companies exposed Mr. Almeida to problems that were unique to content distribution and advertising on the internet.[5]  Problems such as internet server resource allocation, third-party content integration on the World Wide Web, and internet advertising click-fraud were unique problems arising from the context of content distribution over a computer network and internet-based advertising.

5.      The internet created the wholly new challenge of compensating internet content providers based on contextual advertising from a third party.  Mr. Almeida recognized the drawbacks in the state of the art at the time, and through his ingenuity and work, Mr. Almeida developed a variety of systems directed at problems unique to advertising and content distribution on the internet.  For example, in 2001, Mr. Almeida filed a patent application that discussed the problems faced by "e-shops" such as Amazon.com, Inc.  These problems included the failure of existing prior art e-commerce platforms to enable the distribution of content,

---

[2] UnoWeb Virtual, LLC is owned by UnoWeb Holdings, LLC.  Mr. Almeida owns over 90% of UnoWeb Holdings, LLC.

[3] *See* Colleen Benson, *People in Business*, SAN FRANCISCO CHRONICLE (May 8, 2000) (Describing TradeYard as an "Internet marketplace for used heavy equipment."  Although common today TradeYard was introducing the novel idea of providing an internet distribution venue to regional brick and mortar stores); *see also Micro General Affiliate Escrow.com Announces Integration of Fully Functional Transaction Settlement Engine by B2B Exchanges*, Micro General Corporation Press Release (December 5, 2000).

[4] *See* Merrill Warkentin, BUSINESS TO BUSINESS ELECTRONIC COMMERCE: CHALLENGES AND SOLUTIONS AT 267 (2002) (Describing the ROIDIRECT.com solution as "such companies provide eServices such as payment processing, logistics, and site monitoring.  Some vendors that provide such services are bccentral.com (from Microsoft.com), Webvision.com, Roidirect.com, dellworks.com, and Websphere from ibm.com.").

[5] *See e.g.*, U.S. Patent App. 2003/0120560, *Method for Creating and Maintaining WorldWide E-Commerce* (filed December 20, 2001) ("At present, there are needs for easy and affordable worldwide e-commerce solutions where the seller can have their goods and services sold.").

advertising, and product listings from third parties.  Integration of third party content was lacking in prior art systems.  "[A] buyer will have to move from e-shop to e-shop in the e-mall.  Time is thus wasted and sales can be lost.  Furthermore, the dynamic e-mall concept cannot be created without an elaborate and expensive e-commerce infrastructure."[6]

6.      In creating UnoWeb, Mr. Almeida developed inventions directed to content management.  These inventions led to the patents-in-suit, that disclose systems and methods for distributing and managing access to data where data is stored in multiple external servers or independent content hosts in the same server location.  These content management patents address, among other things, the difficult problem of managing access to data supplied by third parties.

## UNOWEB'S LANDMARK CONTENT MANAGEMENT SYSTEMS

7.      Mr. Almeida started the work on the patents and software development in 2001 and founded UnoWeb in 2004 in response to a need for systems and methods that would allow an e-commerce system to manage data supplied by third parties (*e.g.*, remote servers communicating over the internet).  One of Mr. Almeida's insights was that manufacturers and distributors of goods needed a simple way to make goods and content available to a broad audience of users.  "Today's e-commerce requires solutions where seller can have their products/services available to a broad base of buyers, also, virtually available to other e-shops, satellite e-malls and e-malls where they will be offered to a broader clientele base."[7]

8.      Mr. Almeida created UnoWeb's OpenCommerce system, which was designed to enable providers and distributors of content to make products available over a shared infrastructure, "offering solutions with a single e-commerce infrastructure at one location.  All the required solutions are available to every OpenCommerce Provider, OpenCommerce Stores,

---

[6] U.S. Patent App. 10/029,073 (filed December 20, 2001).  The '091 patent is a Continuation-in-part of application No. 11/930,422, filed on Oct. 31, 2007, now Pat. No. 7,730,083, which is a division of application No. 10/029,073 filed on Dec. 20, 2001.

[7] U.S. Patent App. 10/029,073 at ¶ 10.

OpenCommerce Distributor, OpenCommerce Manufactures, and E-Services within the virtual OpenCommerce Network."[8]



John Almeida, *UnoWeb OpenCommerce Architecture*, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS PLAN (2002).

9.      UnoWeb's solutions overcame problems unique to the internet and inherent in the state of the art at the time.  "At the present, there are needs for easy and affordable worldwide e-commerce solutions where seller can have their goods and services sold without the expertise or the expenses that today's e-commerce requires."[9]  Existing e-commerce web sites required providers of content to update services and products directly on [a specific and predetermined] e-commerce platform.[10]

---

[8] John Almeida, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS MODEL at 2 (2002).

[9] U.S. Patent App. 10/029,073 at ¶ 4.

[10] *See e.g.*, U.S. Patent No. 6,901,378 (this patent was cited on the face of UnoWeb U.S. Patent App. 10/029,073 and describes limitations in existing systems contemporaneous to Mr. Almeida's inventions as "none of the prior art methods have provided for associating information with an image that indicated which products were available for that particular image. Typically, different types of products were separately displayed and only after a user chose a particular type of product."); *see also* U.S. Patent No. 5,745,681 (this patent assigned to Sun Microsystems and cited on the face of UnoWeb's U.S. Patent App. 10/029,073 and published in April 1998 described limitations in the prior art as including "[t]here is currently no reliable means to deduce the user's account information from the information accompanying a random request for a page.").

10.     Existing systems for e-commerce offered providers the ability to create separate e-shops but required that providers use the same platform and commonly the same server. Limitations in existing systems severely restricted the ability to scale the aggregation of content and were difficult to implement.

11.     UnoWeb's OpenCommerce system enabled the transmission of data by content providers using a shared infrastructure.  Further, as outlined in a 2001 document from UnoWeb, the use of a virtual network resource infrastructure would allow the exchange of content from remote servers without the need for the providers of content to directly update content or handle the creation of e-commerce infrastructure tasks such as "e-commerce web site hosting, credit card gateway, [and] logistics."[11]



John Almeida, UNOWEB WORLDWIDE OPENCOMMERCE PLATFORM at 23 (July 2001).

---

[11] John Almeida, UNOWEB OPENCOMMERCE OVERVIEW PRESENTATION at 10 (2001).

12.     John Almeida filed U.S. Patent App. 10/029,073 in December 2001, a parent application of the '091 patent, which disclosed inventions relating to the UnoWeb system.  The patent application described a system where "[r]equests are sent and data received from different servers in the network or over the Internet.  And they are requests for database objects (table rows) from each server.  Once they're received, they are combined and a single dynamic table is formed, then it is related with the virtual table 1502 (ID column) at virtual server 1500."[12]



John Almeida, *UnoWeb OpenCommerce Architecture*, UNOWEB OPENCOMMERCE WORLDWIDE SOLUTIONS BUSINESS PLAN (2002) (describing the architecture of the UnoWeb OpenCommerce system).

13.     UnoWeb developed a variety of technologies that have been widely adopted by leading internet companies.  These UnoWeb technologies can be seen, in part, at www.unoweb.com and www.unowebdemo.com.  The UnoWeb inventions included the development of a social networking platform that allowed the aggregation of content from a variety of sources.  For example, UnoWeb's WayVi system was a Social Network for individuals

---

[12] U.S. Patent App. 10/029,073 at ¶ 138.

and businesses that enabled the consolidation of third party content on a single webpage.

UnoWeb WayVi enabled the aggregation of images, photos, blogs, shopping carts, and

connection information on one page that was displayed to a user.  The below screenshot shows

the ability of the UnoWeb WayVi system to retrieve data from a variety of sources for display on

a single webpage.



*UnoWeb WayVi Webpages*, UNOWEBDEMO.COM WEBSITE (showing the aggregation of content
including (1) photo albums (2) blog entries (3) applications and (4) user connections).

   14.    Mr. Almeida recognized that the growing adoption of the internet and the

increasingly distributed nature of content on remote servers presented unique challenges to

making relevant content accessible to users.  Mr. Almeida also had the insight that the challenges

presented in controlling access to third party content could be applied outside the context of

e-commerce, with wide applicability to internet advertising where a third party could take

advantage of the internet to provide relevant contextual advertising.  To address the need for

third parties to utilize contextual advertising, UnoWeb developed AdMind and integrated

AdMind into UnoWeb's WayVi System.  The below screenshot shows how advertisements from

third parties would be linked to relevant content using the UnoWeb platform.



*UnoWeb AdMind System*, UNOWEB.COM WEBSITE (Showing the UnoWeb AdMind system that enabled advertisers to place contextual advertisements.  This screenshot also shows how the UnoWeb system enabled users to be charged for their context-based advertising.).

15.   UnoWeb AdMind enabled advertisers to purchase advertising that would be displayed with contextually relevant content supplied by third parties.  The below screenshot from the UnoWeb system shows how advertising would be associated to third party supplied content furnished by content providers.  UnoWeb provided a mechanism for associating advertising with relevant content.



*UnoWeb AdMind Associated Content*, UNOWEB.COM WEBSITE (showing the association of AdMind advertising with third party content).

16.    UnoWeb's AdMind system overcame a problem unique to the internet by allowing third party content to be associated with paid advertising and enabling content providers to be compensated for provisioning content relevant to associated advertising.



*UnoWeb AdMind Administration Screens*, UNOWEB.COM WEBSITE (showing the signup process for UnoWeb AdMind).

17.     UnoWeb's AdMind also developed the use of keyword-based associations

between advertisements and third party created content.  For example, during the signup process

for AdMind, an advertiser could associate an advertisement with various keywords.  These

keywords subsequently could be used to display relevant advertisements linked to content.



*AdMind by UnoWeb*, UNOWEBDEMO.COM WEBSITE (this screen shot shows how the UnoWeb
system enabled the inputting of keywords that could be used to match advertising content from
third parties to content providers).

18.     UnoWeb's patents and published patent applications have been cited in over 200

United States patents and published patent applications as prior art before the United States

Patent and Trademark Office.[13]  Companies whose patents and patent applications cite the

UnoWeb patents include:

- eBay, Inc.
- Amazon.com, Inc.
- Adobe Systems, Inc.
- Microsoft Corporation
- International Business Machines Corporation
- Xerox Corporation
- AT&T Corporation
- Yahoo!, Inc.
- Facebook, Inc.

---

[13] The 200 forward citations to the UnoWeb patents do not include patent applications that were
abandoned prior to publication in the face of the UnoWeb patents.

- Hewlett- Packard Development Company, L.P.
- Raytheon Company
- CBS Interactive, Inc.
- Apple, Inc.
- Demandware, Inc.
- Symantec Corporation
- Websense, Inc.
- Sony Corporation
- Panasonic Corporation
- Netapp, Inc.
- Vodafone Group PLC
- Google, Inc.
- Qualcomm, Inc.
- Alibaba Group Holding Limited
- Ericsson Television, Inc.

## THE PARTIES

### UNOWEB VIRTUAL, LLC

19.     UnoWeb is a small, Plano, Texas-based company.  UnoWeb developed information management solutions to allow companies and individuals to manage internet content, provide contextual internet advertising, and conduct internet-based social networking services.  UnoWeb depends on patent protection to effectively license its innovative technologies.  UnoWeb has secured licenses for its patents from a number of leading technology companies.

20.     John Almeida, the inventor of the patents-in-suit and owner of UnoWeb, resides in the Eastern District of Texas.  UnoWeb's principal place of business is located in the Eastern District of Texas at 5761 Robbie Road, #3403, Plano, Texas 75024.

21.     Sears' use, sale, and distribution of products and services that infringe the patents-in-suit has caused and continues to cause UnoWeb irreparable harm.

22.     As a result of Sears' unlawful competition in the Eastern District of Texas and elsewhere in the United States, UnoWeb has lost sales and profits and suffered irreparable harm, including lost market share and goodwill.

### SEARS

23.     Sears is the parent company of Kmart Holding Corporation ("Kmart") and Sears, Roebuck and Co.  Sears was formed as a Delaware corporation in connection with the merger of Kmart and Sears Roebuck and Co.  Sears has its principal place of business in Hoffman Estates, Illinois.  Sears' registered agent in the state of Texas is CT Corporation System, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201-3136.  Upon information and belief, Sears uses, sells, and offers to sell products and services throughout the United States, including in the Eastern District of Texas, and introduces products and services that perform infringing processes into the stream of commerce knowing that they would be used and sold in this judicial district and elsewhere in the United States.

24.     Because Sears actively targets customers in the Eastern District of Texas and throughout the United States, Sears' infringement adversely affects UnoWeb and John Almeida, UnoWeb's founder and owner, who lives and works in the Eastern District of Texas.

### JURISDICTION AND VENUE

25.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

26.     Upon information and belief, this Court has personal jurisdiction over Sears in this action because Sears has committed acts within the Eastern District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Sears would not offend traditional notions of fair play and substantial justice. Defendant Sears, directly and, upon information and belief, through intermediaries (including distributors and/or others), has committed and continues to commit acts of infringement in this District by, among other things, making, using, offering to sell, and/or selling products and/or services that infringe the patents-in-suit.

27.     On information and belief, goods purchased on Sears.com and Kmart.com are regularly shipped into the State of Texas and into this District.

28.     On information and belief, Sears.com and Kmart.com target customers in the United States through online marketing and advertising, including users within the State of Texas and within this District.

29.     On information and belief, millions of web users from the United States (including from within the State of Texas) visit Sears' infringing website properties every day.

30.     Sears operates at least two stores in the Eastern District of Texas.  One is located in the Longview Mall, at 3510 Mccann Road, Longview, TX 75605.  Another is located in the Collin Creek Mall, located at 851 N. Central Expressway, Plano, Texas 75075.  Sears also operates numerous other stores throughout the state of Texas.

31.     Sears also operates several Kmart stores in Texas.  One is located at 5000 San Dario, Laredo, Texas 78041.  Another is located at 1801 South 10th Street, Mcallen, Texas 78503.

32.     Sears has transacted and does transact business within the state of Texas, and has committed acts of patent infringement in Texas.  Sears is subject to this Court's specific and general personal jurisdiction pursuant to at least its substantial business in this forum, including regularly doing or soliciting business, engaging in other persistent courses of conduct, and/or deriving substantial revenue from goods and services provided to individuals in Texas.

33.     Venue is proper in this district under 28 U.S.C. §§ 1391(b)-(d) and 1400(b).  Defendant Sears has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas.

## TECHNOLOGY BACKGROUND

34.     Advances in computational power and the explosive growth of the internet have led to the development of content management and advertising systems that aggregate data from third party servers on a network.

35.     Mr. Almeida invented ways of overcoming drawbacks arising from content management and internet advertising systems.  Mr. Almeida's inventions improved upon the then-available technology, enabled the production and generation of more effective

communications, distribution of applications over a computer network, reduced costs, and resulted in improvements to content management and internet advertising systems.

36.     The patents-in-suit teach specific computer-based content management systems, including systems that use a virtual network resource infrastructure for hosting and managing heterogeneous data from third party providers.

37.     Mr. Almeida disclosed his inventions to the public, had the claims in the patents-in-suit repeatedly scrutinized on grounds of eligibility, novelty, non-obviousness, written description, and enablement by examiners at the U.S. Patent Office, overcame hundreds of prior art references through prosecution proceedings, paid and continues to pay filing and maintenance fees to the U.S. Patent Office, and was awarded the patents-in-suit.  Because of those actions, the public has benefitted from Mr. Almeida's disclosures, and each claim of the patents-in-suit is statutorily protected by a presumption of validity that can be rebutted only by clear and convincing evidence.

38.     The examiners who issued the patents-in-suit examined claims in parent and related applications, and repeatedly cited many prior art references, before satisfying themselves that the claims of the patents-in-suit differed substantially from the paradigm of earlier technology.

39.     During examination of the patents-in-suit, the U.S. Patent Office had access to and knowledge of the then-current state of the art and earlier technology.  The materials cited on the face of the patents and considered by the examiners include over one hundred U.S. patents and published applications, foreign patent documents, and non-patent references.

### 1.     U.S. Patent No. 8,037,091

40.     U.S. Patent No. 8,037,091 ("the '091 patent"), entitled *Method of Using a Code to Track User Access to Content*, was filed on October 31, 2007, and claims priority to December 20, 2001.  UnoWeb is the owner by assignment of the '091 patent.  A true and correct copy of the '091 patent is attached hereto as Exhibit A.

41.     The U.S. Patent Office's examination of the '091 patent has extended over a decade.  The '091 patent issued after *Bilski v. Kappos*, 561 U.S. 593 (2010).

42.     The '091 patent claims a technical solution to a problem unique to computer networks – tracking a user's access to content gathered from multiple servers and providing the user with a list of content previously viewed by the user using a surf code reference.

43.     The claims in the '091 patent require a server hosting content from three content hosts and the use of a unique Uniform Resource Locator Address.  These are technological solutions that are rooted in the internet and have no comparable analog outside the realm of the internet.

44.     A unique feature of the internet is providing users with access to content aggregated from different web servers.  The content in some instances might be presented in composite web pages.  There was a need to track user access to specific pieces of content that, although displayed on a single web page, were aggregated from different web servers.  "From this scenario it is clear that there is a need for a mechanism to track and keep the user surfing experience."  '091 patent, col. 21:53-54.

45.     The '091 patent is directed at solving a problem unique to the internet – the tracking of internet user access to content aggregated from several hosts and enabling the display of previously accessed content to a user.  To accomplish this objective, the '091 patent provided technological solutions, including the use of a surf code reference that enabled the tracking of a user as content from different hosts is accessed.  The patent specification explains that a surf code reference "is used for automatically storing a reference for each information supplied to each client and it forms the surf user-list.  Once the user requests his/her surf user-list, the server will use each surf code reference and create the surf user-list and sent it to the user.  A surf user-list will only include information that was previously viewed by the user."  '091 patent, col. 21:54-62.

46.     Claim 7 of the '091 patent recites means-plus-function claim limitations governed by 35 U.S.C. § 112(f).  The corresponding structures in the '091 patent specification include

algorithms that improve the functioning of a computer by being more efficient: "the web server 3554 will first save the requested webpage or the product page's code in the session variable user_tracking_code 3560 and second it will fetch the webpage or the products page 3726 and send it 3728 to the web browser 3552." *See, e.g.*, '091 patent cols. 11:4-12:32, 22:1-58, figs. 34-39.

47.    The '091 patent addresses a problem faced by web site operators who had a need to track access to internet content that came from multiple web servers.  Further, there was a need to allow users to access content that they had viewed even if the content had come from multiple web servers.  The '091 patent teaches new technological solutions to these problems. The solutions include: (1) a virtual server computer hosting a plurality of content hosts, (2) enabling users to access a virtual server providing a view of content supplied from multiple web servers, [14] (3) assigning a surf code reference to each of the pieces of web content that are accessed by a user, [15] and (4) storing a user list comprising the surf code reference such that a user can subsequently access a list of the web content they had accessed.

---

[14] The claims of the '091 patent are similar to those that have been found to constitute patent eligible subject matter.  *See, e.g., DDR Holdings v. Hotels.com*, 773 F.3d 1245 (Fed. Cir. 2014) (invention directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant was eligible for patenting because the invention addressed an important challenge—*i.e.*, retaining website visitors through the use of computer technology); *KlausTech, Inc. v. Admob, Inc.*, Case. No. 10-cv-05899 Dkt. No.145 at 5 (N.D. Cal. Aug. 31, 2015) (upholding the validity of an internet advertising patent that "employs a new approach to control and monitor the display of advertisement on Internet browsers and seeks to solve technical problems that do not exist in the conventional advertising realm"); *Mirror World Techs. LLC v. Apple Inc., et al.*, Case No. 13-cv-419 Dkt. No. 346 at 18 (E.D. Tex. July 7, 2015) (upholding the patent eligibility of claims where "the invention is a method whereby a computer system organizes every data unit that it receives or generates chronologically with time stamps").

[15] The '091 patent also is directed at generating specific data structures.  The generation of specific data structures has been found to confer patent eligibility by various courts.  *See e.g., Advanced Marketing Sys., LLC v. CVS Pharmacy, Inc.*, Case No. 15-cv-00134 Dkt. No. 77 at 10 (E.D. Tex. Nov. 19, 2015) (Order Adopted at Dkt. No. 95 January 25, 2016) (denying without prejudice Defendants' motion to dismiss patents directed to discount coupons: "The presence of these structures counsels away from summarily concluding that the asserted claims are directed to an abstract idea.").

48.     The '091 patent discloses methods to prevent visitors from being lured away by third-party merchants.  The methods disclose a system to retain web site visitors by processing data from various web servers.  "[T]hey will have a broad selection without having to go to many different e-shops to find what they're looking for, and also be able to view web pages in their own native language."  '091 patent, col. 1:66-2:2.  Instead of transporting a web site visitor away from an owner's site, a user is displayed related content from the third-party merchant: "e-services/contents can be retrieved from different server by another server (secondary server) and this secondary server will make any or all of these e-services available to one or more servers (tertiary servers) and each of the tertiary servers will make these e-services available to a client." *Id.*, col. 20:58-62.  This allows a web site to display content from various web servers without risking the loss of visitor traffic.

49.     The '091 patent discloses methods that are directed to challenges particular to the internet (*e.g.*, retaining web site visitors).  The patent's claims do not merely address the performance of a business practice known from the pre-internet world and require it to be performed on the internet.  Instead, the claimed solutions are necessarily rooted in computer technology and are directed to overcoming a problem specifically arising in the realm of computer networks.  The need to track a user accessing content retrieved from various hosts presented a new challenge.  Hewlett Packard Development Company, L.P., in a patent application filed in 2000 (that is cited on the face of the '091 patent), described the challenges presented by tracking user access to content from multiple hosts.

> Computer users are increasingly accessing the internet, for entertainment, informational, and work purposes using a variety of computing devices. Accessing and using the internet is often referred to as 'surfing the net/web.' . . . Bookmarks are essentially short cuts that allow a user to quickly access favorite websites. . . A bookmark, then, is essentially stored navigation data that allows a user to efficiently return to a favorite website. [16]

50.     At the time of the inventions claimed in the '091 patent, processing, transmitting, and aggregating electronic data from various hosts and tracking users access to specific pieces of

---

[16] *See also* U.S. Patent App. 09/752,058 at ¶¶ 5-6.

content presented new and unique issues over the state of the art.  As explained in the '091 patent: "products/services cannot be shared among other e-malls or e-shops even within their own network of dynamic e-shops at the e-mall."  '091 patent, col. 1:43-45.

51.    Although the methods taught in the '091 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '091 patent claims were innovative and novel.  "Currently, dynamic e-mall will not allow the creation of specialized e-shops that can sell their products/services in conjunction with similar products/services from others e-shops."  '091 patent, col. 1:55-57.

52.    Further, the '091 patent claims improve upon the functioning of a computer system by using a surf code reference to allow the granular identification of content accessed by a user.  The inventions disclosed in the '091 patent improve the functioning of a computer system by improving the security of the system and reducing the amount of data stored (and computer resources utilized).  U.S. Patent No. 6,189,024, which was issued in 2001, is cited on the face of the '091 patent and subsequently assigned to Facebook, described drawbacks in the state of the art at the time.  These drawbacks in existing systems prevented a user from accessing an accurate list of web content visited where accessing occurred across multiple web sessions.

> This "history" function generally lasts throughout the time that a user instantiates the browser program until the point where the browser is terminated.  This time period is what traditionally defines a "session."  The session history function on browsers record the current navigation path of the user, i.e. it is a single-threaded path. . . . [A] drawback to this approach is apparent when a user navigates through a path on a typical browser, visiting page A 201 first. Page B 202 is then visited, followed by page C 203.  The user backtracks up this path to page B 205 and deviates to page D 207.  ***Once the user goes off the path, information about the previous path that was deviated from is lost.***[17]

53.    U.S. Patent App. 09/752,058, which was assigned to Hewlett Packard (and is cited on the face of the '091 patent), describes drawbacks of existing systems that enabled the tracking of users to web content as including the creation of duplicate data, impairing the amount

---

[17] U.S. Patent No. 6,189,024, col. 1:18-33 (emphasis added).

of computer memory space available on a computer system, and creating security issues from exposing a user's navigation data.

> A user's navigation data can, however, create some difficulties.  In particular, a user's navigation data can be difficult to manage. . . . Because users often access the internet using different computers, a user's navigation data may become dispersed across the various computers operated by the user thus making access to this data difficult if not impossible.  ***This can result in a data integrity issue where one user's navigation data overwrites or obscures navigation data*** for other users.  There may also be ***a security issue when users leave navigation data on a computer they may casually use***.  Additionally, the storage of ***navigation data locally occupies storage space in the user's computer memory drive thereby limiting the storage available for other uses***.[18]

54.    One or more claims of the '091 patent teach the gathering of data from hosts to create a surf code reference.  The creation of a label such as a "surf code" has been found to confer patent eligibility by various courts.[19]  The '091 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," "a building block of the modern economy," or the broad concept of "content management."  Instead, they are limited to a concretely circumscribed set of methods for retrieving content on a host, assigning the content a surf code reference and using the surf code reference to track user access and generate a list of content accessed by a user.

55.    The '091 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of web content management.  For example, one or more claims of the '091 patent require assigning a surf code reference to each of the different contents viewed by a user, storing a user list based on the surf-code reference for each of the different contents, and enabling a user to access a user list identifying the previously viewed contents.

---

[18] U.S. Patent App. No. 09/752,058 at ¶ 9 (emphasis added).

[19] *See, e.g., Gonzalez v. InfoStream Group, Inc.,* Case. No. 2-14-cv-00906, Dkt. No. 160 at 7 (E.D. Tex. Feb. 6, 2016) (finding, with respect to steps for "'gathering' one type of data and 'producing' a 'label,]'" that "'[g]athering' data may describe an abstract idea, but 'producing' a 'label' based on that data does not describe an abstract idea").

56.     The preemptive effect of the claims of the '091 patent is concretely circumscribed by specific limitations.  For example, claim 1 of the '091 patent requires:

> A method of using a code to track user access to content, the method comprising the steps of:
>
> > providing a virtual server computer, the virtual server computer hosting a plurality of content hosts, the plurality of content hosts comprising a first content host, a second content host and a third content host;
> >
> > enabling each content host in the plurality of content hosts to be accessible by a user at a unique Uniform Resource Locator address;
> >
> > wherein the plurality of content hosts comprise a plurality of contents;
> >
> > enabling user interaction with the plurality of content hosts through the first content host without the user having to navigate to the unique Uniform Resource Locator address of any other content host in the plurality of content hosts;
> >
> > displaying to the user accessing the first host content from at least two different content hosts;
> >
> > assigning a surf code reference to each content displayed to the user, the surf code reference comprising information that identifies each such content displayed;
> >
> > supplying from the virtual server computer a user list to the user, the user list comprising an identification of each such content viewed by the user; and
> >
> > presenting any such content viewed by the user to the user requesting such content from the user list.

57.     The '091 patent does not preempt the field of web content management systems, or prevent use of alternative web content management systems that enable the viewing of previously accessed web content.  The '091 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive elements are not necessary or obvious tools for achieving content aggregation from third parties, and they ensure that the claims do not preempt other techniques for web content management.  Further, the twenty-one patents cited in the prosecution history include numerous systems that are not preempted by the claims of the '091 patent.

58.     The '091 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the internet or using a conventional computer.  Further, the claimed subject matter of the '091 patent is not a pre-existing but undiscovered algorithm.

59.     One or more claims of the '091 patent require the use of a computer system through specific claim limitations, including (1) a virtual server computer, (2) a unique resource locator address, (3) three content costs, (4) assigning a surf code reference, (5) supplying the virtual server computer a user list, and (6) storing on the virtual server computer storage medium the surf-code reference.

## 2.     U.S. Patent No. 9,589,273

60.     U.S. Patent No. 9,589,273 ("the '273 patent"), entitled *Method of Three-Level Hosting Infrastructure*, was filed on September 6, 2011, and claims priority to December 20, 2001.  UnoWeb is the owner by assignment of the '273 patent.  A true and correct copy of the '273 patent is attached hereto as Exhibit B.  The '273 patent claims specific methods of three-level hosting infrastructure that provide a server computer accessible to users through hosts.  The '273 patent issued after *Bilski v. Kappos*, 561 U.S. 593 (2010), *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012), and *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347 (2014).

61.     The '273 patent is directed at solving a problem unique to the internet: "Today's e-commerce requires solutions where seller can have their products/services available to a broad base of buyers, also, virtually available to other e-shops, satellite e-malls and e-malls where they will be offered to a broader clientele base."  '273 patent, col. 1:63-67.  The '273 patent goes on to explain that, "[T]he process for creating and updating e-malls, satellite e-malls, e-shops, e-distributors and web sites must be on-line and easy to setup and use.  Buyers on the other hand, need a solution where they will have a broad selection without having to go to many different e-shops to find what they're looking for, and also be able to view web pages in their own native language."  '273 patent, col. 1:67-2:7.

62.     The '273 patent addresses a problem faced by sellers of online products and services that lack their own e-commerce resources and infrastructure.  Further, the '273 patent addresses a problem faced by buyers of online products and services having to visit multiple

sellers' websites to make purchases.   The '273 patent teaches new technological solutions to these problems.  The solutions include: (1) enabling users to access a virtual server providing a view of content supplied from multiple sellers, such as e-malls and e-shops, [20] (2) providing e-commerce hosting infrastructure to e-shops, thereby obviating the need for the e-shop to create and maintain their own e-commerce infrastructure or web server, [21] and (3) providing a wider selection of products and services available to any e-mall, satellite e-mall, e-shop and website within a virtual network.

63.     The '273 patent discloses methods "for the creation of specialized e-shops, satellite e-malls, e-malls and web sites, tailored uniquely to a specific market segment. Further, it will simplify buyers' decision by offering them a broad and specialized selection of products/services." '273 patent, col. 2:49-53.

64.     The '273 patent discloses methods that are directed to challenges particular to the internet.  The patent's claims do not merely address the performance of a business practice known from the pre-internet world and require it to be performed on the internet.  Instead, the

---

[20] The claims of the '273 patent are similar to those that have been found to constitute patent eligible subject matter.  *See, e.g., DDR Holdings v. Hotels.com,* 773 F.3d 1245 (Fed. Cir. 2014) (invention directed towards generating a composite web page that combined certain aspects of a host website with information from a third-party merchant was eligible for patenting because the invention addressed an important challenge—*i.e.,* retaining website visitors through the use of computer technology); *KlausTech, Inc. v. Admob, Inc.,* Case. No. 10-cv-05899 Dkt. No.145 at 5 (N.D. Cal. Aug. 31, 2015) (upholding the validity of an internet advertising patent that "employs a new approach to control and monitor the display of advertisement on Internet browsers and seeks to solve technical problems that do not exist in the conventional advertising realm"); *Mirror World Techs. LLC v. Apple Inc., et al.,* Case No. 13-cv-419 Dkt. No. 346 at 18 (E.D. Tex. July 7, 2015) (upholding the patent eligibility of claims where "the invention is a method whereby a computer system organizes every data unit that it receives or generates chronologically with time stamps").

[21] The '273 patent also is directed at generating specific data structures.  The generation of specific data structures has been found to confer patent eligibility by various courts.  *See e.g., Advanced Marketing Sys., LLC v. CVS Pharmacy, Inc.,* Case No. 15-cv-00134 Dkt. No. 77 at 10 (E.D. Tex. Nov. 19, 2015) (Order Adopted at Dkt. No. 95 January 25, 2016) (denying without prejudice Defendants' motion to dismiss patents directed to discount coupons: "The presence of these structures counsels away from summarily concluding that the asserted claims are directed to an abstract idea.").

claimed solutions are necessarily rooted in computer technology and are directed to overcoming a problem specifically arising in the realm of computer networks.

65.     Although the methods taught in the '273 patent have been adopted by leading businesses today, at the time of invention, the technologies taught in the '273 patent claims were innovative and novel.  "Currently, dynamic e-mall will not allow the creation of specialized e-shops that can sell their products/services in conjunction with similar products/services from others e-shops."  '273 patent, col. 1:59-62.

66.     The '273 patent claims are not directed to a "method of organizing human activity," "fundamental economic practice long prevalent in our system of commerce," "a building block of the modern economy," or the broad concept of "content management." Instead, they are limited to a concretely circumscribed set of methods for providing a hosting infrastructure on a server computer that enables a first host to provide hosting services to a second host and enables the first host to create the second host.

67.     The '273 patent claims are directed toward a solution rooted in computer technology and use technology unique to computers and computer networking to overcome a problem specifically arising in the realm of web content management.  For example, one or more claims of the '273 patent require providing a hosting infrastructure on a server computer that enables a first host to provide hosting services to a second host and enables the first host to create the second host.

68.     The preemptive effect of the claims of the '273 patent is concretely circumscribed by specific limitations.  For example, claim 1 of the '273 patent requires:

> A method of three-level hosting infrastructure, the method comprising the steps of:
>
> providing a hosting infrastructure on a server computer, the hosting infrastructure serving a plurality of hosts, the plurality of hosts comprising a first host and a second host, wherein said first host and said second host are selected from the group consisting of an e-mall, satellite e-mall, e-shop, e-distributor, e-manufacturer and web site:
>
> receiving a content at the server computer;
>
> the hosting infrastructure implementing the steps of:

enabling the first host to provide hosting services to the second host;

enabling the first host to create the second host;

enabling communication between the server computer, the first host and the second host;

managing the first host and the second host;

making the content available to the second host through the first host; and

enabling the second host to transmit the content to a computer accessing the second host when the second host obtains the content through the first host.

69.     The '273 patent does not preempt the field of web content management systems, or prevent use of alternative web content management systems that provide hosting infrastructure.  The '273 patent includes inventive elements—embodied in specific claim limitations—that concretely circumscribe the patented invention and greatly limit its breadth.  These inventive elements are not necessary or obvious tools for providing e-commerce infrastructure, and they ensure that the claims do not preempt other techniques for web content management.  Further, dozens of patents cited in the prosecution history include numerous systems that are not preempted by the claims of the '273 patent.

70.     The '273 patent does not claim, or attempt to preempt, the performance of an abstract business practice on the internet or using a conventional computer.  Further, the claimed subject matter of the '273 patent is not a pre-existing but undiscovered algorithm.

71.     One or more claims of the '273 patent require the use of a computer system through specific claim limitations including (1) hosting infrastructure, (2) plurality of hosts, (3) server computer, (4) hosting services, and (5) client computer.

## COUNT I
## INFRINGEMENT OF U.S. PATENT NO. 8,037,091

72.     UnoWeb references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

73.     Sears makes, uses, sells, and/or offers for sale in the United States products and/or services for web content management.

74.     Sears makes, sells, offers to sell, imports, and/or uses the Sears websites (e.g., www.Sears.com, www.Kmart.com) (the "Sears '091 Product").

75.     On information and belief, the Sears '091 Product includes web content management software.

76.     On information and belief, the Sears '091 Product is available to businesses and individuals throughout the United States.

77.     On information and belief, the Sears '091 Product is provided to businesses and individuals located in the Eastern District of Texas.

78.     On information and belief, Sears has directly infringed and continues to directly infringe the '091 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for web content management, including but not limited to, the Sears '091 Product, which includes infringing web content management technologies.

79.     By making, using, testing, offering for sale, and/or selling web content management products and services, including but not limited to the Sears '091 Product, Sears has injured UnoWeb and is liable to UnoWeb for directly infringing one or more claims of the '091 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

80.     On information and belief, Sears also indirectly infringes the '091 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

81.     On information and belief, Sears has had knowledge of the '091 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Sears knew of the '091 patent and knew of its infringement, including by way of this lawsuit.

82.     On information and belief, Sears intended to induce patent infringement by third-party customers and users of the Sears '091 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Sears specifically intended and was aware that the normal and customary use of the accused products would infringe the '091 patent.  Sears performed the acts that

constitute induced infringement, and would induce actual infringement, with knowledge of the '091 patent and with the knowledge that the induced acts would constitute infringement.  For example, Sears provides the Sears '091 Product that has the capability of operating in a manner that infringes one or more of the claims of the '091 patent, including at least claim 1, and Sears further provides documentation and training materials that cause customers and end users of the Sears '091 Product to utilize the product in a manner that directly infringe one or more claims of the '091 patent.  By providing instruction and training to customers and end-users on how to use the Sears '091 Product in a manner that directly infringes one or more claims of the '091 patent, including at least claim 1, Sears specifically intended to induce infringement of the '091 patent. On information and belief, Sears engaged in such inducement to promote the use and sale of the Sears '091 Product, *e.g.,* through Sears user guides, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '091 patent. Accordingly, Sears has induced and continues to induce users of the accused product to use the accused product in its ordinary and customary way to infringe the '091 patent, knowing that such use constitutes infringement of the '091 patent.

83.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '091 patent.

84.     As a result of Sears' infringement of the '091 patent, UnoWeb has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Sears' infringement, but in no event less than a reasonable royalty for the use made of the invention by Sears together with interest and costs as fixed by the Court, and UnoWeb will continue to suffer damages in the future unless Sears' infringing activities are enjoined by this Court.

85.     Unless a permanent injunction is issued enjoining Sears and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '091 patent, UnoWeb will be greatly and irreparably harmed.

## COUNT II

## INFRINGEMENT OF U.S. PATENT NO. 9,589,273

86. UnoWeb references and incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

87. Sears makes, uses, sells, and/or offers for sale in the United States products and/or services for web content management.

88. Sears makes, sells, offers to sell, imports, and/or uses the Sears websites (e.g., www.Sears.com, www.Kmart.com) (the "Sears '273 Product").

89. On information and belief, the Sears '273 Product includes web content management software.

90. On information and belief, the Sears '273 Product is available to businesses and individuals throughout the United States.

91. On information and belief, the Sears '273 Product is provided to businesses and individuals located in the Eastern District of Texas.

92. On information and belief, Sears has directly infringed and continues to directly infringe the '273 patent by, among other things, making, using, offering for sale, and/or selling products and/or services for web content management, including but not limited to, the Sears '273 Product, which includes infringing web content management technologies.

93. By making, using, testing, offering for sale, and/or selling web content management products and services, including but not limited to the Sears '273 Product, Sears has injured UnoWeb and is liable to UnoWeb for directly infringing one or more claims of the '273 patent, including at least claim 1, pursuant to 35 U.S.C. § 271(a).

94. On information and belief, Sears also indirectly infringes the '273 patent by actively inducing infringement under 35 U.S.C. § 271(b), at least as of the date of service of this Complaint.

95. On information and belief, Sears has had knowledge of the '273 patent since at least service of this Complaint or shortly thereafter, and on information and belief, Sears knew of the '273 patent and knew of its infringement, including by way of this lawsuit.

96.     On information and belief, Sears intended to induce patent infringement by third-party customers and users of the Sears '273 Product and had knowledge that the inducing acts would cause infringement or was willfully blind to the possibility that its inducing acts would cause infringement.  Sears specifically intended and was aware that the normal and customary use of the accused products would infringe the '273 patent.  Sears performed the acts that constitute induced infringement, and would induce actual infringement, with knowledge of the '273 patent and with the knowledge that the induced acts would constitute infringement.  For example, Sears provides the Sears '273 Product that has the capability of operating in a manner that infringes one or more of the claims of the '273 patent, including at least claim 1, and Sears further provides documentation and training materials that cause customers and end users of the Sears '273 Product to utilize the product in a manner that directly infringe one or more claims of the '273 patent.  By providing instruction and training to customers and end-users on how to use the Sears '273 Product in a manner that directly infringes one or more claims of the '273 patent, including at least claim 1, Sears specifically intended to induce infringement of the '273 patent. On information and belief, Sears engaged in such inducement to promote the use and sale of the Sears '273 Products, *e.g.,* through Sears user guides, product support, marketing materials, and training materials to actively induce the users of the accused products to infringe the '273 patent. Accordingly, Sears has induced and continues to induce users of the accused product to use the accused product in its ordinary and customary way to infringe the '273 patent, knowing that such use constitutes infringement of the '273 patent.

97.     To the extent applicable, the requirements of 35 U.S.C. § 287(a) have been met with respect to the '273 patent.

98.     As a result of Sears' infringement of the '273 patent, UnoWeb has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Sears' infringement, but in no event less than a reasonable royalty for the use made of the invention by Sears together with interest and costs as fixed by the Court, and UnoWeb will continue to suffer damages in the future unless Sears' infringing activities are enjoined by this Court.

99.     Unless a permanent injunction is issued enjoining Sears and its agents, servants, employees, representatives, affiliates, and all others acting or in active concert therewith from infringing the '273 patent, UnoWeb will be greatly and irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff UnoWeb respectfully requests that this Court enter the following relief:

A.     A judgment in favor of Plaintiff UnoWeb that Sears has infringed, either literally and/or under the doctrine of equivalents, the patents-in-suit;

B.     An award of damages resulting from Sears' acts of infringement in accordance with 35 U.S.C. § 284;

C.     A permanent injunction enjoining Sears and its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents, and all others acting in active concert or participation with Sears, from infringing the patents-in-suit;

D.     A judgment and order requiring Sears to provide accountings and to pay supplemental damages to UnoWeb including, without limitation, prejudgment and post-judgment interest; and

E.     Any and all other relief to which UnoWeb may show itself to be entitled.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, UnoWeb requests a trial by jury of any issues so triable by right.

Dated:  July 9, 2018

Respectfully submitted,

/s/  *Elizabeth L. DeRieux*  _____
Elizabeth L. DeRieux (TX Bar No. 05770585)
CAPSHAW DERIEUX, LLP
114 E. Commerce Ave.
Gladewater, Texas 75647
Telephone: 903-845-5770
E-mail: ederieux@capshawlaw.com

OF COUNSEL:

Eric J. Carsten (CA SB No. 232494)
CARSTEN LAW PC
12424 Wilshire Blvd., 12th Floor
Los Angeles, CA 90025
Telephone: 424-273-4160
E-mail: ecarsten@carstenlaw.com

*Attorneys for UnoWeb Virtual, LLC*